If I may, before I begin, if I could reserve 10 minutes for rebuttal, if that would be appropriate. You were in the courtroom just when I started off. You've got to keep track of it yourself. Yes, ma'am. Our clocks don't allow for it. Thank you. May it please the Court, my name is Brad Bartlett. I'm counsel for Great Basin Mine Watch. With me in the courtroom this morning is my co-counsel, Mr. Roger Flynn. We're here this morning to discuss Petitioner's challenge to EPA's November 13, 2002 rule, which unlawfully redesignates an individual clean air area, Area 61, into two areas, upper and lower. This redesignation will remove critical limitations on emissions of harmful pollutants of particulate matter, or PM, sulfur dioxide, or SO2, and nitrogen oxides, or NOx. The major activity in Upper Unit 61 is a large open pit gold mine run by the Barrick Corporation. It is undisputed that Barrick is a major source of air pollution and emits more than 250 tons per year of NOx, PM, and SO2. That in itself is not enough to invalidate the rule, right? Invalidate the rule? It is our contention, Your Honor, that To make the rule arbitrary and capricious. The mere presence of the major source. Well, in order to trigger what's called the minor source baseline date, or the requirements of the Act, you have to have a major stationary source which impacts the baseline area. Now, all parties agree that Barrick is a major stationary source. I know. My question is, is that alone enough, in your view, to make the rule arbitrary and capricious? Yes, ma'am. And how do you get there? We get there by the fact that because Barrick is, number one, a major stationary source and or a major modification, underwent a major modification. Okay. What I was asking was, is it enough, in your view, that Barrick is a major source? Period. No other qualifications. I believe, Your Honor, that also takes the submission of an application. Okay. Under the regulations. All right. So it's a major source plus submission of an application. Now, does the application have to be just any dirty old ordinary application, or does it have to be an application for a PSD review? Well, in this case, Your Honor, the Title V permanent application in question incorporates PSD. Okay. I'm trying to take it a step at a time. It does have to be a PSD application. Yes? Or an application that incorporates the PSD requirements as a major stationary source. So ---- Okay. How do you get the ability to incorporate? Where does that come from? From the Title V provisions of the Clean Air Act. Title V, I thought, was directed to a different issue. That is, whether some entity was operating in compliance. That's correct. Operating. Whereas the PSD review is directed at pre-construction permits. Right. That would be the government's view, is that PSD is only triggered for pre-construction. I realize it's the government's view, but what I'm asking you is why isn't that correct? There is that difference, right? There is a difference. This is a major stationary source. All parties agree to that. And it submitted an application. For an operating permit. For an operating permit. As a major stationary source. In the absence of that operating permit, Barrick could not operate or construct or couldn't carry out activities. Okay. So now explaining why the fact of the operating permit application, how does that get you into a PSD application? Because by virtue of submission of that application, that source is a major stationary source under the PSD regulations as admitted in the application itself. We've already established that just being a major source isn't enough. You have to have a PSD application. Or an application, air quality permit application. Yes, ma'am. I gather that this source has been in operating since before 1977 or whenever it was that you have to have originally. Yes. So it can operate without triggering the baseline if it doesn't apply for anything. That's correct. If it's never applied for anything. And this goes back to the definition of minor source baseline date. All right. Which comes out of EPA's regulations. The applications that it made for modifications were made as PSD applications? They were made as modifications to the source as was operating. They were made as part of the operating permit application, right? That's correct. They were made as modifications. All right. So how do you get from the operating permit, how do you get out of the operating permit a PSD application? So I believe the confusion is that there's a whole misnomer of the necessity for a PSD application. That's just kind of a coined title that EPA has thrown out. It's the application for an air permit. Let me point you to the requirements of the PSD regulations which define minor source baseline date. Minor source baseline date is triggered when a major stationary source, that's any source that has the potential to emit 250 tons per year of any pollutant or a major modification, quote, submits a complete application under the relevant regulations. And the relevant regulations are the PSD regulations. Right. And that's what happened here. Well, Barrick submitted the PSD application. That's my problem. If you can just answer that in simple English, it will really help me. Okay. If you take a look at the permit, it might help to review Petitioner's Exerted Record at page 630. What am I looking for? That's Barrick's permit. In that permit, Barrick is a major source of air pollution under EPA's regulations. As to which there's no problem. Pardon me? There's no issue about that. Right. See, my problem is real simple. My problem is how do you get the application for an operating permit under Title V to translate into an application under the PSD regulations? I understand that. Yeah. And it's by virtue of the source simply being a major stationary source. But we've agreed that that's not enough. You've got to have an application to be a PSD source. Right. And not just a PSD application. Because Title V encompasses all of the programs under the Clean Air Act. If we take a look at this Court's decision in Western States Petroleum Association v. EPA, let me quote from that decision. Under Title V, quote, all Clean Air Act substantive and procedural requirements applicable to a pollutant emitter are written in the emitter's Title V permit. Now, Title V contemplates all of the PSD requirements. So by virtue of submission of a Title V permit, PSD is encompassed. Title V incorporates those provisions. You don't just get a separate PSD permit or a separate nonattainment permit. You get one permit, Title V. But even if the Court doesn't consider Barrick and Barrick's application to trigger the minor source baseline date, Barrick's modifications in 2001, as Judge Canby referred to, created an independent rationale or reason for triggering the minor source baseline date. Barrick's combined modifications constituted a major modification of the source. Now, there's no dispute that the combined total of Barrick's NOx emissions from the three modifications made in 2001 exceed the 40 tons per year significance threshold. Major modification is defined under EPA's regulations as, quote, any physical change in or change in the method of operation of a major stationary source that would result in a significant, or 40 tons per year, net emissions increase of NOx. Now, was that before the EPA threw Nevada's application to redesignate? That's correct. It was part of the record? No. The modifications were made in 2001. The redesignation began in 2002. No, no, no. That's not my question. Were the modifications, the proposed modifications in the record before the EPA threw Nevada's application to redesignate? I believe all those modifications were forwarded to EPA and should have been in front of the agency. Well, should have been, would have been, could have been. Were they part of the administrative record? I believe the record demonstrates that they were forwarded to EPA. Do you know where I could look to find it? I could get that for you. Okay. Thanks. I'll pull that for you. The reason I brought up the major modification definition is because Barrick meets those requirements. It is a major modification pursuant to those three permit modifications. We've already said it is a major stationary source. Everyone acknowledges that. It has met the significance thresholds. There's no real dispute that if you net the emissions or combine those emissions from those three modifications, they exceed 40 tons per year of NOx. So by virtue of those modifications, the minor source baseline date was triggered for the entire area, hydrographic area 61. Therefore, it was unlawful for EPA to come back and do a geographic redesignation and thereby untrigger the minor source baseline date for this entire area. If it were. But how can you untrigger something that was never set? Well, I think the regulations set up that the minor source baseline date, and this was, again, EPA's regulations, is triggered when you have a major modification that submits a complete application under the relevant regulations. By virtue of submission of those applications, the minor source baseline date is triggered. I mean, we don't need a decision from the agency that says, well, the minor source baseline is triggered. That's what we're disputing about. The agency believes it's not triggered. We believe by virtue of the submission of those applications and by virtue of the modifications to this source, you've got the triggering of the requirements of PSD. Here EPA would like to undo those requirements so it could locate a brand new power plant in lower area 61. We believe that's inconsistent with the requirements of the Act. We had a case before. First, if they're able, if the baseline isn't triggered, they can put the power plant in whether it's split or not, whether the unit is split or not. That's not established by the record, Your Honor. Well, if I say if. If the baseline, if the minor source baseline. If there's no baseline for the unit, then a new major source can come in. Then a major source can come in. Right. Then the power plant could come in. What we're seeing is the State of Nevada and EPA trying to further chop up Nevada. In other words, in the Reno-Sparks Indian Colony case, that established the premise that the State of Nevada is divided into 250-plus clean air areas. Now, in order to have more sources come into the State of Nevada, you see the State and EPA trying to further hack up these clean air areas to allow new sources in. They're basically creating postage stamp type areas to allow polluters to come in and operate. We believe that's inconsistent with the act, that all polluters should be required to comply with these PSD increments. The last point I would like to make is that redesignation of Area 61 cannot proceed without supporting data showing that EPA analyzed the boundaries of the new baseline area, lower Area 61, will not intersect the area of impact of the Barrick Mine. Now, this is important because baseline area for the State of Nevada is defined as hydrographic areas or Area 61. So when a new source comes online and has an impact, the agency should be tracking increment consumption out to one microgram per cubic meter impact level. So the PSD requirements still apply to all sources within that area, but it becomes all the more important because these big sources have an impact and they consume this increment, the available increment, within this baseline area. Did the EPA make factual determinations in connection with this final rule? It did not, Your Honor. The EPA has not analyzed what the impact boundary of the mine is or whether the new geographic boundaries. Let me ask you this. Did they determine that the division of Area 61 into two units, a lower and an upper, would trigger or untrigger the baseline? That determination was not made because EPA did not. My question was, did they determine that? No. EPA has not. They did not? No. Did they determine that there would be no incremental increase in pollution added to the area by virtue of the division? No. I believe what happened was EPA did not consider the Barrick Goldstrike Mining Complex to be a major stationary source. I'm not asking you whether you think it was correct or whether they considered the necessary component items to reach a correct decision. I'm asking you if it's not true that they reached those two determinations, whether they're correct or not. The record doesn't demonstrate that, and I believe I have answered your question correctly, correct me if I'm wrong, that the area of impact from the Barrick Goldstrike Mine did not reach the lower Area 61. Is that what you're getting at? Yeah. Let me just state my full question. My understanding is that among the other things that the agency determined was that there would be no incremental increase in pollution by virtue of this division and that it wouldn't untrigger, as you've described and discussed with us. Right. Now, assuming that they made those and that they're factual determinations, what degree of deference does this Court owe those determinations? Well, those determinations, I believe, are questions of law. And therefore, I don't think we owe the agency deference on those issues. Your view is that we would treat those as legal determinations and review them de novo? That's correct. Because I think the record demonstrates that, for one, you have a major stationary source for a modification that occurred in 2001, that Barrick submitted an application that triggered the requirements of PSD to this area, and that in 2002, when this rulemaking came to redesignate these areas, to split them in half, EPA couldn't simply pull the plug on the PSD requirements applicable to this clean air area. And I think that's what's in front of this Court right now. I'd like to reserve some time for rebuttal, if I may. Surely. I'll ask a question at the very beginning. If the mine had submitted, in one of its 2001 applications, a modification that would show an increase of 50 tons per year, would that have triggered the... Yes, it would have, Your Honor. Okay. So your position is that you don't have to aggregate those. Is that correct? That's correct. And, in fact, the permitting authority here in the State of Nevada, the State of Nevada through its agency, asked that very question about Barrick's 2001 modifications. It asked for further explanation as to whether the April 2001 modification is separate and distinct from the August 2001 modification. Barrick provided a further explanation, told the State of Nevada, that the April 2001 modification had to do with taking emergency generators for power and converting them to the limited backup use, versus the August 2001 had to do with backfilling operations and replacing outdated equipment. Well, yeah, but it's all from the same facility, isn't it? How do you... Doesn't that require under your regulations that you aggregate? The bare fact that modifications are made at the same facility does not equate to allowing for aggregation for separate modifications. And the support that I can point to, Your Honors, is actually block-quoted by Petitioner at page 20 of their reply brief. They quote from the regulations under 40 CFR 52.21 sub B, sub 3, sub I. That first sub A talks about a particular physical change or change in the method of operations. And this was precisely Nevada's question to Barrick. Tell us why there were... Okay, but it starts by saying, with respect to any regulated pollutant, the amount by which the sum of the following exceeds zero. And the first is the increase from a particular one. This is the sum of these things. And the second is any other increases or decreases that are contemporaneous with the particular change. And then they say it's contemporaneous in the next page if it occurs within five years. Well, you don't get past part A because, again, these are two separate particular changes. Well, if something tells me it's the sum of the following and then there's a colon and then a list, I don't think you stopped after one. Well, before you even get to the net emissions increase regulation, I guess I should have backed up. First you have to know whether there was a significant modification at all. Here there was not a significant modification because, again, in April 2001 it was less than 40 increase. In August of 2001 it was about eight tons increase. If the facility wants to make benefit of the net emissions increase and get itself out of the PSD program, that is what this regulation talks about. And it says that if you want to trade emissions, for example, here Barrick actually took away some sources in August of 2001 with respect to its backfilling operations. If its modification had come close to 40, it could have said State of Nevada as the permitting authority, please look at all of our modifications that relate to this project over five years, and we would like to get a credit for those changes that we have made that have decreased emissions. And so this is what this regulation is geared at. Further support I would point to the court is in the EPA's new source review manual, which is actually quoted by Barrick in its further explanation to the State of Nevada about why its April 2001 modification is distinct from its August 2001 modification. And Barrick's explanation can be found at excerpts of Record 199, and on that page Barrick quotes from a new source review manual that the EPA issued in 1990 that walks permitting authorities and facilities through the program. And that page talks about what I was just getting at, that you don't go to the net emissions increase analysis if there's not a significant modification to begin with. At the same time, the EPA cautioned a deliberate attempt to avoid a PSD by piecemealing a particular operation change into separate and distinct groups to get away from the requirements of the program could subject the source to an enforcement action, with the allegation being that you committed a major modification without submitting the necessary permit application. So, again, that is why Nevada asked the question of Barrick. Let me ask you this. If the two modifications ran afoul of that part of the manual, how does that play into this issue? If there was compelling evidence in the record that they were not separate and distinct issues, then perhaps Great Basin would have a stronger argument that there's been arbitrary and capricious action here. Here the record at least shows that Barrick purported to explain the differences in the two particular physical changes. The State of Nevada was satisfied after that inquiry. The EPA also looked at the application and the materials. That's why it's in the record. And it had no comments. And our position is that that is at least a sufficient basis to affirm the rule under review, because, again, the record does not compel the conclusion urged by Great Basin. Now, if Great Basin was concerned that there was some obstruction of the PSD program here, perhaps it has other remedies under the citizen suit provision of the Clean Air Act saying, Barrick, you really, in fact, in substance, should have applied for a PSD program back in 2001. And if it's ultimately successful in such a suit, perhaps EPA would entertain a petition for reconsideration of the rule. But we don't have to go there again, because the only thing before this Court is the reasonableness of EPA's rule. And there is no document in the record that supports Great Basin's view that these were not separate and distinct modifications, and therefore the cumulative should be what is determinative of the baseline date for Area 61. I'm still ‑‑ I don't want to repeat myself too much, but I'm still having trouble with that regulation. It seems to me if a major modification is any physical change in the method of operation of a major source that would result in a significant net emission increase, and then they say, well, a net emission increase is defined as the sum of the following, the increase from the particular change, and then any other increases or decreases. Now, you're saying, well, that's really aimed at decreases, but why does it talk about increases? Well, it talks about increases because, again, if the source is opening up its books to a five‑year period in order to get some decreasing credits, it also has to make sure it's taking account of all the same contemporaneous increases. I also would ‑‑ But if those increases push it over 40 tons a year, it doesn't matter. At the end of the day, that's correct. If the net balance is over 40, then it would not be able to make avail of the net emissions increase definition here. Can we tell on the basis of this record whether there's been a net increase or not? We can tell that there has been no significant or no major modification by Barrick. And we can also tell that ‑‑ How can you tell that? You can tell that because I believe Your Honor was quoting from the Clean Air Act itself about the definition of a modification. It says any change in ‑‑ any physical change or the change in the method of operation. Here you don't ‑‑ again, we've had two distinct physical changes. So it's not any change over a five‑year period for purposes of the Clean Air Act definition there, but rather it's the separate and distinct inquiry that supports, getting to your question, the rule under review here. If the Court is further concerned about the net emissions increase and how it works, as I've explained, we'd be happy to submit supplemental briefing on that because really the issue wasn't flushed out in the opening brief and you try to be as preemptive as you can in a response brief, but perhaps more elaboration should have been noted on our part in this area. Getting back to your inquiry with Great Basin, you're correct that the mere existence of a major emitting facility in an area does not establish the baseline date. That's clear from the face of the regulations. When it says relevant regulations, no fewer than three sentences ahead of that, it lays out 40 CFR 52.21 and 40 CFR 51.166. Those must be the relevant regulations. And that's in fact ‑‑ It said the above regulations then, I guess. It didn't. It didn't say that. However, the EPA has interpreted in a preamble language starting from 1980, which is in the excerpts of Record 43, left‑hand column, that that means the PSD permit application. That's the way it's worked since 1980. I believe the plain language is clear on that. At one point, opposing counsel said that you don't apply for a PSD permit. You just apply for a permit. Is that true? That's not true. What they're trying to say is that that means any ‑‑ relevant regulations mean any air quality related permit application at all. And that's, as Judge Reimer was discussing, there's distinct differences between Title V and PSD. Title V, unlike Great Basin's contention, is not about making new decisions that should have been made at the preconstruction time. Rather, Title V wants to have everything in one permit document. That's why you incorporate all prior permit reviews into that document. And, as Judge Reimer noted, it's for enforcement purposes, so you can tell in one document, what are all these requirements that apply to this facility in terms of air quality? So you have it in one document. And Title V also looks to the monitoring issue, that is, the compliance, since the time of construction, to ensure that it's operating as it represented it would in its preconstruction application. That means if someone should have applied for a PSD permit and didn't. Well, then EPA has discretion to, and the state has discretion as well, to retroactively change the baseline dates. That's why I was mentioning earlier, you know, if there's a scenario where there's litigation against a facility operator that it didn't submit the right application at the relevant time, then that is, and that's ultimately found to be true, then that can be submitted to the agency and the agency can make a decision on it. And its decision, provided there's jurisdiction, is reviewable by a court of appeals. Is there anything about the redesignation request that, in effect, triggers an examination to see whether someone should have but didn't have? No. The Clean Air Act is remarkably deferential to EPA on this issue. It just says, within a certain amount of time, the administrator shall approve or reject the state's redesignation request. Now, EPA has elaborated a little bit further in its regulations. It says that the redesignation must be on the basis of sufficient data. And then further, because the redesignation under Section 107 of the Clean Air Act has significance for the prevention of significant deterioration program, the EPA regulations on PSD impose one restriction for redesignations, saying that the new area created cannot be any smaller than the area of impact around the facility that triggered the minor source baseline date. Here, the Nevada application said there was no PSD source. That's correct. Does EPA have an obligation to go behind that and see whether that's right or wrong, or does it go behind it? Sure. The EPA has to be satisfied that the representations made are accurate ones. We have the entire record here, and there was nothing to compel a conclusion to doubt the state of Nevada's finding on that issue. Now, again, using the phrase no PSD source is kind of loosely stated. I mean, yes, BEREC is a major emitting facility within the meaning of the PSD program, and therefore permitting authorities have to watch to make sure any significant modifications it may engage in do not trigger the requirement to submit a permit. But, again, the mere fact that it's a major emitting facility, as Your Honors already noted, is not making a, quote, PSD source. So there's some loose shorthand phrases here, but in substance, the state of Nevada did, in fact, represent to the EPA, because it was the most familiar with BEREC and its history, saying it is not a facility that has been obligated to secure a PSD permit for any altogether new construction or a major modification. And so your bottom line is that there's nothing in the record that was before the EPA that compels a conclusion that the modifications were major. That's correct. In fact, Great Basin certainly had the opportunity to submit any information it believed to the contrary, and nothing it submitted compels the conclusion of the EPA either, which also relates to the second issue that Great Basin has brought here about the area of impact analysis. Great Basin could have raised at least a bare question that BEREC's analysis on its face was problematic. We're not saying that the EPA or the state of Nevada has looked at that area of impact analysis. What we were saying is the only evidence in the record, which was submitted by BEREC after an extensive study on its part, is that the area of impact comes nowhere close to lower 61. And we don't know whether that, I mean, as you say, that hasn't been focused on. If there has been a trigger, then you'd have to look more closely at the question. Well, Your Honor, you've touched on it. Right. The first objection of Great Basin's part is really the controlling one here. If, as we contend, they're wrong on that objection, then the Court doesn't need to reach the second issue because the administrative record supports it. If we were forced to reach the issue, I think we would have to say, well, the EPA really hasn't ruled on that. Well, Your Honor, there is also the precedent from this Court about an obligation to show prejudice, that is, that if EPA had done what they contend it should have done, the outcome necessarily would have been different. We don't know. We don't know because EPA didn't do it. So we don't know what they would have come to. We don't know. Well, but we also don't know any reason to suspect that it's so dead wrong that it would reach into lower 61. What were the reasons for dividing Unit 61? The reasons were several, technical and administrative. I'll grant you that a primary consideration was the factor that no minor source baseline date was triggered. That was a primary consideration, but there are also more. They'll divide any unit where there's not been a trigger? No. EPA has wide discretion here, and if it was convinced that this was part of a larger program to get everything down to postage stamp size, perhaps in that appropriate case EPA could come out differently. But here we have an area of 550 miles, nearly 550 miles that was divided. The smallest post division is now under 200 square miles, just under 200 square miles. So we're hardly in the postage stamp situation here. Southwest, the postage stamps are pretty big. I can understand Your Honor's point, but for nationwide purposes, it's also helpful to know that the State of Illinois, for example, has baseline areas on a township-by-township basis. It's more crowded there. Perhaps in certain areas. If the EPA determined that the purpose of the division of the area was to bring in a new major source, would that affect its judgment? I don't believe it would, Your Honor, because the EPA here was clear as to the guidelines it was looking to to make a decision. And those guidelines were does it comply with the PSD regulations and will it not hinder the state's ability to manage its air quality program. And even if it were the case that the state acted with the intent to facilitate the entrance of a major emitting facility, as Judge Tanby noted, that major emitting facility could have started with or without the EPA action here. That's true. It would put the mine at a little more risk if it wants to make modifications in the future. The barrack you're talking about in the future. That's correct as a theoretical basis, but we don't know. For example, let's pretend there was no split of Area 61. We don't know whether the entrance of a major emitting facility, an altogether new one, and therefore a PSD triggering source in Lower 61 would have consumed so much of the increment that it would really have much of an effect at all on any day-to-day modifications that barrack finds itself in need of. Both before and after the rule at issue, barrack is under an obligation to get a PSD permit or convince the authorities that it should be granted a PSD permit if it engages in a major modification. If it's a minor modification, then it's not under that obligation. Do EPA have the authority to unwind a division? Yes, they do. There's initiation provisions under the Clean Air Act. They can initiate a redesignation in Section 107 of the Clean Air Act. If there are no further questions, for the overriding reason that the administrative record supports the rule under review, we ask that the review petition be denied, and I'd like to turn the podium over to Mr. William Fry of Nevada. Sure. Good morning, Your Honors. I'm Bill Fry on behalf of Intervenor State of Nevada, and I'd like to thank the Court for allowing the additional time for this morning's argument, as well as thanking the United States for sharing the time. To begin, I'd like to join in the argument already made by the United States. Great Basin asserts that Nevada is merely trying to accommodate new polluters and additional emissions increases and circumvent the requirements of the Clean Air Act's PSD program, and this is flat-out wrong. This Court a year ago confirmed that in 1978 the State divided the State into 253 air quality management areas, and in the 25 years since then, we've re-designated three times. We re-designated in 1982 by splitting Steptoe Valley into three, and we re-designated with this rulemaking, which re-designated for PM10 and split Area 61. We didn't chop the State up, and that was intervening 25 years since we designated the 253 areas. Nevada's been one of the fastest-growing states in the nation, with the majority of that growth all occurring in the south in Las Vegas and in the west in the Reno-Washoe County area, and we've not re-designated those areas. We haven't chopped them up. Instead, we cut, we divide it in half one and into three another in the rural, unpopulated, undeveloped areas of the state to allow reasonable economic development balanced against protection of air quality resources. And it seems that if we were in the business of chopping up the state to accommodate business, all of that would have occurred in the east, I mean, rather, in the west and the south. I suppose, what if you were in the business just of chopping up a few rural places to permit economic development? Would that be an air quality reason for? Well, when you look at and look at Area 61, which we divided, an area of 550 square miles. And even by Western standards, that's a relatively large area. We divided it using the same historic method that we divided initially. We looked at the terrain, and we divided the lower area, which has a 4,600-foot elevation, and separated that in two large ranches, about four industries along the Interstate Highway 80 corridor. And the lower area is 490 square miles now. The upper area is 156 square miles. And the elevation up there is 5,500 feet to 7,000 feet. No one lives in the upper area. There's mining activity there. So we've accommodated reasonable development. That development can go on in the south. And the upper area is probably going to own, you know, from the state's perspective, we see that it will be nothing but mining activity up there because of the nature of the terrain. Well, these are economic development reasons. I just wondered whether the reasons for splitting a unit have to be related to air quality rather than economic development. Or for the management of it. It's easier to manage, of course, a smaller area. Because if it's divided, if Area 61 is divided and a power plant is built in the south, that will trigger the baseline date in the lower area. And it's easier to keep track of those, a smaller area, to keep track of the minor sources that then would locate there or that are located there that would consume increment after the minor source baseline is set. So from a management perspective, it's easier to keep track of what businesses are there, what they're emitting, when they're emitting, what businesses come and go, and how that affects the area. So in a sense, it's somewhat easier from the state's perspective to manage the smaller areas. In this case, the lower area, which now is essentially ranch land or rangeland, is still 490 square miles with probably 25 families living in the area. And I think the next objection that Great Basin has made is I'm out of time. So I'll just finish that up and then we'll give Mr. Bartlett a little extra time. Let me just conclude by saying that even back in 1980 when the PSD regulations took effect, EPA contemplated whether a state could divide an area, whether the baseline had been triggered or not. And I just want to end with this quote from 45 Federal Register 52716, that since triggering baseline dates is an important factor in managing growth, EPA has concluded that states should have jurisdiction over their own baseline dates. Consequently, states may submit redefinitions of the boundaries of attainment or unclassifiable areas at any time. If EPA agrees that the available data support the change, it will redefine the area as requested. And I thank you. All right. Thank you, Mr. Fry. Mr. Bartlett. Thank you, Your Honor. Let me just start by saying that the permit modifications that you had asked about before were submitted to EPA prior to the proposed rule. That can be found and discussed in our opening brief, pages 28 and 29. Before I turn to the modification issue, let me address some of the issues raised by Mr. Fry. There is discretion. EPA does have discretion to redesignate the geographic boundaries of clean air areas. However, once the minor source baseline date is triggered for a clean air area, there are limits on that discretion. According to EPA's own rulemaking, once a major stationary source or modification has occurred or located in a clean air area, the agency is barred from redrawing the geographic boundaries of the clean air area in an effort to untrigger the requirements of the PSD program. Let me quote from EPA's rulemaking. This is from their August 7, 1980 rulemaking establishing the PSD regulations. And I'll quote. By setting the minor source baseline date at the time a major source or modification impacts an area and preventing that date from being changed by subsequent area redesignations, the system ensures that future growth in that baseline area will be assessed for its air quality effects from that date forward. Now, this is consistent with Section 107 of the Clean Air Act, which allows for redesignations. It's consistent with EPA's regulations. It's consistent with EPA internal memorandums that we've provided to this Court. And it's also consistent with other EPA redesignations. Let me point specifically to redesignations that EPA approved for North Dakota, where North Dakota requested to split a baseline area into two areas, which is fine. However, EPA explained in that notice that its approval was predicated on the fact that, and I'll quote, the state has indicated that it is maintaining the baseline dates that have already been established and implemented in these two areas. The same for the state of Minnesota, when Minnesota similarly requested a redesignation to designate a baseline area at the county level. The agency explained there that, quote, baseline dates, which have already been triggered, would not be untriggered by this action. That's what we're talking about here. Mr. Bartlett, what paper in the record compels the EPA to decide that a major modification triggered the baseline date? It is the submission of those modifications to the agency. And as I've said, those modifications were in front of the agency prior to this rulemaking. Okay. And this comes out of the application for? If I could. Application in April and August? Yes, Your Honor. To Nevada. By virtue of the submission of the modifications themselves, which aggregate those permitted levels, and also by that November 16, 2001, permit renewal modification, I'm sorry, permit renewal itself, which incorporated those three permits which were still pending. So November 16, 2001, not only did we have three modifications which were pending in front of EPA, but we also had a permit renewal which incorporated the three modifications. Those modifications netted or combined or aggregated all exceed the 40 tons per year threshold to be a major modification. And EPA was supposed to look through Nevada's representation that there was no PSD source to those applications? It was EPA's responsibility to determine whether the minor source baseline date was triggered in Area 61. That's what Great Basin Mine Watch raised in its comments and asked EPA to do. We said that the minor source baseline date has been triggered. It's been triggered because Barrick is a major stationary source and has undergone a major modification. Therefore, you have to look at this, EPA. These permits were pending before the agency. The agency could have looked at it, could have made this determination, could have said, well, yes, well, if we aggregate these emissions, it exceeds the significance threshold. I suppose if we agreed with you that we have to aggregate, then we would presumably have to remand to the agency to look at everything that's happened within five years of the proposed modification. There may be other things they've done that since they weren't aggregating, they didn't look at. I don't think there are. I think we can base it on the November 16th, 2001. Well, I don't know what else has happened within a five-year period. Well, all of that should have been incorporated in that one permit application. Well, they didn't think that they had to aggregate. Are we able to aggregate? We don't know, we don't have any idea what this mine has done for the five years. Right. All of those emissions should have been in that application. The agency didn't take a hard look at that. It should have said, Barrick, what are you up to? Now, Barrick does admit, and the agencies do admit, that three modifications were made and that those modifications, the emissions from those modifications in and of themselves, surpassed the significance thresholds. Now, EPA, when Mr. Doyle was up here, alluded to something in the record that stated there was a decrease and pointed this Court to excerpts of record on page 199. There's nothing in the record on that page that states there's a decrease in emissions. The only thing that the record demonstrates as of November 16, 2001, is that three modifications were incorporated. And as we've demonstrated in our briefs, those modifications exceed 40 tons per year. Because they've exceeded that 40 tons per year significance threshold, the minor source baseline date was triggered for Area 61. The agency, as I've just demonstrated, cannot untrigger it. The agency is required, as Your Honor pointed out, to net those emissions. Let me quote from EPA's rulemaking. This comes out of a July 21, 1992, rulemaking. And I'll quote here from EPA. In attainment or clean air areas, certain increases above prescribed significance levels would also be aggregated with all other net increases in emissions at the source within a five-year contemporaneous period. Agency needs to be looking at this stuff. It needs to be determining whether or not these significance thresholds are correct. And that's the rulemaking from what? From the what were you just quoting? I'll give you this. It's 57 Federal Register 32250. And that's an EPA rulemaking from July 21, 1992. Essentially, what the agency is doing here is, you know, in its own words, if you look at the rulemaking, it's creating, allowing sham permitting. It's allowing Barrick to chop up and make one modification here, another modification here, another modification here. The problem, I thought somehow, is that this isn't, I mean, they're not acting on the permit. They're acting in reliance on the permitting, though. They're making decisions knowing full well that these permit applications are pending before the agency, and they're making determinations on the basis of those permits by playing what essentially amounts to a shell game, saying, well, we're not going to take a look at this until we make this rulemaking. And then we'll make the rulemaking, and we'll carve this basin up, and then we'll determine whether or not the minor source baseline date has been triggered for maybe the upper portion now. And they'll never look at the baseline area in totality. What we'd like, and what petitioners are arguing, is that the agency needs to make these determinations first. It needs to take a look at the pending modifications, determine whether or not the significance thresholds have been met, whether the 40 tons per year limit has been exceeded, and determine whether the minor source baseline date for this hydrographic area has been triggered, because if it has been triggered, the agency cannot pull that back. It cannot untrigger the requirements and the applicability of the Act to this clean air area. If there are no other questions. It can divide a triggered area. I mean, but you're saying that there's at least one thing they'd have to examine, and that would be the impact of the PSB source on the area that's switched on. The State of Nevada chose to define its baseline areas not as the area of impact around a source. Now, some states have taken that route, tried to define baseline area as the area of impact around a source. The State of Nevada has chosen to find its baseline areas, its clean air areas, as hydrographic areas. As Mr. Perry said, there were 253 hydrographic areas. So every time a major stationary source of modification occurs in one of those areas, it triggers the minor source baseline date for the whole area. And why the one microgram per cubic meter impact level is important is because more increment is going to be consumed in that one microgram per cubic meter impact area than, say, in areas that are outside of that impact area, clean air area. Thank you. All right. Thank you, counsel, for your assistance in this case. And the matter just argued will be submitted in the court. We'll send recess for the day. Court is adjourned. Thank you. Thank you.
judges: Canby, Rymer, Hawkins